Council, why don't you let your colleagues sit down and then you won't be distracted. Alright. I am Erin Hammond, pro bono counsel for the appellant John Moon in this case. This is a complex appeal, it has about five issues that we need to address today. I would like to reserve three minutes for rebuttal. I will launch into the case. As the court knows, this is a case involving FLSA retaliation claims and also a case involving Title VII discrimination claims. There are some additional issues that we need to address dealing with sanctions that were imposed at the trial court level and also the ultimate dismissal of the case without Mr. Blunt's authority by his trial court counsel. The first issue that I would like to address is the FLSA retaliation claim. That claim was dismissed on summary judgment by the trial court with the trial court ruling that the claim could not be filed in federal court. The trial court argued or held that there was sovereign immunity that precluded filing the claim in federal court. Our position is that that claim is a tort claim and that Alaska has waived sovereign immunity for filing a tort claim. Therefore, we believe that the trial court erred in dismissing the claim. Let me just ask you a question. Where in your affidavit regarding the motion in limine do you state that you complained of racial discrimination in violation of Title VII? Okay, that gets to the Title VII retaliation claim. Yes. In that affidavit, there are numerous instances where Mr. Moon stated that he complained of discrimination. He does not say unlawful discrimination and that is what the ruling turned on. The court objected or found that the magic words weren't there. Mr. Moon had not stated unlawful discrimination. But he clearly stated throughout that he was complaining of discrimination. He also said that he was making a Civil Rights Act claim. He also notified the court that the University Discrimination Diversity Office came in and investigated the discrimination complaint. We believe that right in its totality, the affidavit does show that Mr. Moon had complained of unlawful discrimination. And if you look at the recent Burlington Northern case that came out of the U.S. Supreme Court, where the Supreme Court is talking about the types of arguments that must be made in the Supreme Court, the court also doesn't say unlawful discrimination. It talks about claims of discrimination, claims of discriminatory conduct. It refers to these types of claims using the exact same language, a very similar language that Mr. Moon used in his filings in the trial court. All right, thank you. You can go back to your Title VII claim. Okay. Back to the FLSA retaliation claim. Alaska Statute 950250 clearly states that a claimant may bring an action against the State for a tort claim. Now, there is not a significant amount of law available for whether an FLSA retaliation claim constitutes a tort claim. However, there is the ruling that we relied upon in our briefing, the Byrne case. In that case, which arises out of the Third Circuit, the issue was squarely before the court. Does an FLSA retaliation claim constitute a tort claim? And the Third Circuit analyzed looking at Black's Law Dictionary, the definition of a tort, looking at the statute itself and the purpose of the statute, which is to allow a person to make or interpret four wrongful claims. Looking at those factors and analyzing the statute, the Third Circuit held that, yes, it is a tort or a tort-like claim. What the Third Circuit determined was that the statute sets out the prohibited wrongful conduct. It creates the duty. And then the breach of that duty constitutes the tort. Going back to even law school days, you have the duty, breach, cause of harm elements of the tort. And that's exactly what we had here. For those reasons, we believe that the district court, in this case, erred in dismissing the FLSA retaliation claim. Well, let me ask you the other part of that same question, which is the statute. Now, it seems to me there was this period where the Alaska statute didn't have the phrase in-state court, right? There was a period early on when it didn't have that phrase. There was another period. And during that time frame, this lawsuit was filed. That phrase was not a part of the statute. Right. But then it was reinstated again. Correct. Now, it seems to me there's some evidence, an argument can be made that the failure to include that phrase during that gasp period was a mistake. It was inadvertent. Don't you think there's at least an argument for that? I think that is the argument. Now, if there is an argument for that, does it follow that you can still assert that, you know, the waiver of 11th Amendment immunity has to be unequivocal, right, and clear and all this kind of stuff? And if you know it's a mistake, can you still say it was a clear waiver? Well, I think that there is no information that at the time that this case was filed, anyone knew that that was a mistake. The official version of the code did not include that language. And parties coming before the court seeking relief are entitled to rely upon the official version of the code. Now, some years later, we have the reporter's comment that states, oh, gee, we left out this language by mistake. But that shouldn't preclude a party from pursuing its claim in federal court. All right. Turning to the Title VII retaliation claim a little bit further, our district court judge agreed that if Mr. Moon could demonstrate that he had made a complaint about discrimination to his employer before October 2002, that there was sufficient evidence in the record to continue and to pursue that retaliation claim. Now, we get into whether the proper magic words were used, but the fact of the matter is, there is evidence that could be read in the light most favorably to Mr. Moon, which is the standard on summary judgment, that shows that he did make that complaint in October 2002. Now, if you view the evidence in the light most reasonably to Mr. Moon, even by the district court's own reasoning, that claim should have been allowed to go forward. We believe also that the district court erred in dismissing that claim. Additionally, there is the Title VII discrimination and hostile work environment claims. There's direct discrimination claims. There's hostile work environment claims. For the direct discrimination claims, we have disparity in salaries and overtime pay. Caucasian employees were treated differently than minority employees and differently than Mr. Moon himself, who is both Korean and Buddhist. There's two elements to this claim. There's racial discrimination and religious discrimination claim. Those... Oh, it's a joke. Well, I just wanted to... In your hostile work environment claim, that they were racially, it was racial motivation, you cited only two comments over a period of two years. There are two overt comments. There is the comment that was made to Mr. Moon that he did not understand English. This was made despite the fact that he obtained a master's degree from the University of Alaska, sitting through English-speaking classes. There was also a comment made to him that he couldn't get out of the minority worker mindset and that he would always be an hourly employee because a large component of his claim was that he was entitled to overtime pay for hours that he worked over and above 40 hours a week. In addition to that, there were numerous events that go into the claim. It's looking at the totality of the circumstances. We have the overt discriminatory practices. We also have emails that were circulated to him and to others, calling for prayer groups and holding prayer groups. Those people who participated in the prayer groups who were a religion different from Mr. Moon's were treated better. They were given higher salaries. They were given greater promotions. They were given better job titles. And also minority employees were treated differently in much the same way. Minority employees did not receive the same salaries, the same job titles, the same benefits of employment that Caucasian employees did. So we think that all those aspects go into creating a hostile work environment. It's not just the overt statements because most employers are savvy enough not to make those overt statements, although clearly they are made from time to time. Well, he did initiate an FSLA inquiry prior to any of the cited incidents that you talk about, and he prevailed. And it forced the supervisors to reallocate resources to fund his back pay and so forth. This sort of weakens your inference that that was corrected before he filed his complaint. Well, it wasn't. He wasn't provided with all of the DE. He was given a back pay award. He didn't get some of the other remedies that were available to him. And regardless of whether he was paid under the FLSA, that doesn't remedy the discrimination issue. It doesn't make that go away, and it doesn't make it better. In fact, the evidence in the record is that the discrimination escalated after that was filed, and that's where we get to the retaliation claim. All right. You said that discrimination is, in response to Judge Nelson's earlier question, is replete in terms of what he raised before the university and so on. As I understand it, the district court said there wasn't any evidence that before October 22, 2002, that he had raised the kind of protected activity that would make the October 22 action by the university actually retaliatory against anything. What is it before October 22, 2002, you're relying on to say that what they did thereafter was retaliation? And that is the affidavit that we were discussing earlier that was filed. The defendants filed what they captioned as a motion in limine, and it was converted to a motion for summary judgment late in the case. At that time, because it was originally postured as a motion in limine, Mr. Moon was afforded the opportunity to submit evidence to attempt to defeat the motion for summary judgment. At that time, he submitted an affidavit, and it's about a three-page affidavit, where he explained that he had, in fact, complained to the university about discrimination, that he had attempted to make a civil rights action. He had completed a grievance, and this is contained again in the affidavit, that addressed the two subjects, according to the university. It addressed the discrimination, and it also addressed the FLSA claim. The university rejected that grievance from him, and brought in the diversity office to investigate the complaints of discrimination. At that time, Mr. Moon was not advised that he needed to file a separate additional grievance related to the discrimination claims, and so he didn't do that. He wasn't sophisticated. He didn't know. He was a guy who was trying to go through the system and to get his problems remedied. But he did clearly make the complaints, and the affidavit supports that. So the grievance that he filed, I'm looking at ER 168, which is part of the grievance. Paragraph 3. Paragraph 3 talks about the CAP position is out of compliance with policies, and it says, It has come to my attention the CAP coordinator position is out of compliance on non-discrimination of salary and pay equity. But in context, that seems to be referring to discrimination as between two different campuses. Is that correct? That's not racial discrimination. Correct. That was one of the claims that was made. So this isn't protected activity on race or religion. Not this particular piece of paper, this memo that you're citing. Right. But Mr. Moon made the claims verbally and informally, and also attempted to submit a formal grievance. Unfortunately, it doesn't appear that his trial counsel submitted the original formal grievance to the court. But there was definitely evidence that he had complained of discrimination contained in the affidavit. Based on his affidavit. That's when he talked to Weems. Yes. Weems filed a counter-affidavit saying he doesn't recall any such conversation. Correct. So you're also relying, as I understand it, on a notion that the woman who was head of the anti-discrimination or the non-discrimination office at the university was brought in, as you say, to investigate. Amplify on that a bit. Okay. And I'll try to be quick. We'll give you the time. I'm running a little short on time. But Mr. Moon made his complaint about discrimination, unlawful discrimination in violation of Title VII, as well as the FLSA claims. The university told him that he had to address those issues separately. He couldn't file a two-subject grievance with the university. So he filed a new grievance related to the FLSA claims. And he also worked with the university diversity office, who was brought in to investigate the discrimination. So it's a diversity office. Yes. All right. And they were brought in to investigate. What's the evidence in the record as to when that happened and in relation to the October 22 date? That is contained in Mr. Moon's affidavit. And he says it was before October 22. Yes. And that's the only evidence of that. It is, but that should be sufficient evidence to defeat a motion for summary judgment. Mr. Moon's testimony is competent evidence before the trial court. Okay. I'll give you some time. Let me ask one more question. One of the Title VII claims is that he claims he didn't get overtime, right? Yes, that there was a racial aspect to the overtime. But is that different from the FLSA claim? Well, it is, in that it goes to… Well, does it cover the different period in the FLSA claim? No, it covers… It covers the same period, right? It does cover the same period, but it's another act where minority employees were being treated differently than Caucasian employees and being treated less favorably than Caucasian employees. In terms of not receiving the overtime required by the FLSA, is that the complaint? Are you going to challenge that? Yes, yes. That the FLSA required that this overtime be paid and it was paid only to Caucasian employees? Is that the point? Correct. There was a Caucasian employee who held the same position as Mr. Moon before he took that position. So it's an FLSA claim with an added element to it that is based on race? Well, it had a racial motivation in part. Okay, thank you. I'll give you some extra time on rebuttal. Thank you. Thank you, Your Honors. Good morning. My name is Matt Finley. I'm here on behalf of defendants. Let's dive in and continue this discussion about the retaliation claims. I think there's hopefully I can be of some help to the Court and clarify where the record is. There is nothing in the record that Mr. Moon complained of unlawful discrimination that is prohibited by Title VII prior to January of 2003. Judge Fischer noted that the grievance that Mr. Moon filed in October 2002 indeed referenced a discrimination issue. This is a discrimination issue related to pay between the Fairbanks and Anchorage campuses. This was a Fairbanks versus Anchorage issue. And I'll walk through the record in a minute where there are some communications between Moon and the University discussing this. And it becomes clear that the meeting Mr. Moon had with Mr. Weems was related to this Anchorage-Fairbanks issue. His conversations with Trudy Franklin were related to this Anchorage and Fairbanks issue. And before we go, there are two other points to note. Counsel appropriately cited the summary judgment standard. However, in dealing with retaliation claims, there's another important element to keep in mind. The University must have been aware that he was engaged in a protective activity under Title VII in order for there to be a causal nexus to, say, retaliation. This Court noted that in Rudd, and Judge Fischer noted that in a recent opinion of Thomas v. City of Leverton. So it's not just enough that he subjectively intended to complain of discrimination that is prohibited under Title VII. There must be something in the record that puts the University on notice that that's what he was doing. And the record, as you go through it, reveals that, in fact, everybody understood that this was the Anchorage versus Fairbanks pay issue. And let's start by contrasting, and Judge Fischer noted the pay discrimination issue at Excerpt of Record 168. If you turn to supplemental Excerpt of Record 649, there is a January 2003 grievance. And in that document, he reiterates the Fairbanks versus Anchorage pay issue, and then takes the next step and adds another element to it and notes that he is concerned that this pay discrimination is related to his being in a protective class as a Korean American. So at that point, no question, the University is on notice that he is complaining of something that is prohibited by Title VII. Turning back, if you look at Excerpt of Record 107, this is an email from October 2002 from John Moon to Trader Franklin. Moon's affidavit before the District Court, which noted he met with Mr. Weems and noted he met with Trader Franklin, and notably the affidavit, it's not a question of abject words, he did not say he complained of discrimination prohibited by Title VII in his affidavit. He did say he met with Weems and Franklin to discuss his discrimination complaint. He met with them to discuss the Fairbanks versus Anchorage pay issue. And if you look at Excerpt of Record 107, this is an email from John Moon to Trader Franklin, and it's a very long and a very professional email from Mr. Moon essentially saying, thank you very much for meeting with me, discussing what they discussed at the meeting, and reiterating his concerns and what he wants to see happen going forward. In the entire text of this email, you will find absolutely nothing related to race, the pay discrimination issue. Again, it's an Anchorage versus Fairbanks issue. And for anyone who's spent a lot of time in Alaska, Anchorage versus Fairbanks issues come up all the time. Turning now to Excerpt of Record 113, this is a November 2002 memo from the university to John Moon addressing the various issues he raised in his October 2002 grievance. And you'll see at Excerpt of Record 115, there is a response to the Anchorage versus Fairbanks pay issue. There's certainly nothing in this document that indicates there's a racial element to the dialogue. Finally, if you turn to Excerpt of Record 328, and that's from December 2002, and that's a step four grievance memo from a decision from the university to John Moon. In this document, to the extent there's been claims in the briefing that he was told, you have to file your discrimination claims separately, this was the document that said, we note you have a pay discrimination, this Anchorage versus Fairbanks issue. That is an issue related to pay classifications. That is subject to a separate grievance. And that document instructed him where to file. And so, again, turning to the record, there simply is nothing in the record, and there's nothing in the record of Mr. Moon before the district court, that he did anything that would put the university on notice, that he was complaining of protected activity that was prohibited by Title VII, unlawful discrimination that is unlawful under Title VII until January 2003. Now, before we get to some of the other Title VII claims, I want to briefly address the Fair Labor Standards Act retaliation issue. And I'll do this briefly, if you have questions, I'd be happy to answer them. The university's position is simple. This is not a common law court claim. This is not a common law court claim that is subject to any waiver of sovereign immunity. The Fair Labor Standards Act retaliation claim here is a federally, statutorily created cause of action. But the statute doesn't say common law court. It just says tort. And there are lots of statutory claims, right? Absolutely, but the first question isn't the waiver. The first question is starting the Seminole Tribe. The Supreme Court's decision in the Seminole Tribe said, Congress cannot create a cause of action and haul states into court pursuant to its Article I powers, particularly there under the Congress clause. Congress cannot do that. Soon after Seminole Tribe came out, there were numerous circuit court decisions where plaintiffs noted that, well, the court of Seminole Tribe said, Congress could, however, waive state sovereign immunity pursuant to Section 5 of the 14th Amendment. And Mills v. Maine was one of the first. And there were several of the circuit courts that said no. The Fair Labor Standards Act cannot, excuse me, fairly be characterized as being passed pursuant to Congress's 14th Amendment powers. As I understand the argument here, though, the appellant is not depending upon a federal waiver. He's depending on a state waiver. Right. The state waiver is for common law torts only. It doesn't say common law. Does it? It just says tort. It just says tort, but the intent of the statute is clearly addressed to common law torts. And the case that the appellant cites for this is not a case that said this federal statutorily created cause of action is actually a tort action. That court was... Well, we get it that the intent of the statute is to limit it to common law torts. It would be the context of the statute and how it's applied. And admittedly, we haven't hit that issue in our briefs. But even assuming... And here's another way to get at this. So there's no Alaska case that says that? There's none I'm prepared to cite to you today. But another way to look at this is this, is that the waiver of sovereign immunity has to be clear and unequivocal. And there's nothing in that statute that says a waiver of any federal statutory created cause of action that the state is waiving its immunity for. Burns... Well, it's clear in this sense. You know, a few years before and a few years later, the statute expressly says it's limited to waiver in state court. During this period, it's not so limited. Well, then that's a different issue. This court only needs to address that issue if it concludes that, well, this statutory Fair Labor Standards Act claim is actually a tort claim. If you get there, the answer there is it's why it was omitted from the statute. It was a mistake. A very bizarre mistake. No question about that. But it's a clear mistake, isn't it? Well, yeah, it's a clear mistake. But to waive sovereign immunity, not only does it have to be a clear and unambiguous statement, it has to be an affirmative action by the legislature. It can't be a mistake. It can't be a title. This is an affirmative. It's not a title. It's an affirmative action by the legislature. They passed a statute that waives our immunity, and it's not limited to state court. Isn't that clear and affirmative? Especially if you look at the history that two years before it was limited to state court, two years later it is limited to state court. That's pretty clear, isn't it? Well, it would be clear if the legislature had actually passed an amendment or if the legislature had actually passed anything saying remove this language. The legislature didn't have a hand in this. This was a scrivener's error, a very bizarre one, but it was not an action by the legislature. But, again, taking a step back, we don't need to address this fairly bizarre question in terms of is this a tort? And there's two other ways to look at this. And, again, VIRM does not establish that fair labor standards act claims are tort claims. That was a tax case where a court simply had to fit a fair labor standards act recovery in one or two buckets. It was either a contract bucket or a tort bucket. And the court said, look, there's no statutory bucket to put here, so let's analyze, is this more like a tort or is this more like a contract? And the court came to the conclusion this is more like a tort. You can see the exact same analysis coming up. Say there was not a statute of limitations in the Fair Labor Standards Act, and you would have to look at state law statute of limitations, have one for tort, one for contract, and so you have to figure out which one applies. Taking Mr. Moon's argument forward, you certainly can characterize fair labor standards act retaliation 215.83 as a tort-like recovery. On the other hand, Section 207, which is the section that Mills, Humane, and the other appellate courts specifically said is subject to Supreme Court-specific decision, Sentinel Tribe, there is no labor statute of immunity, you could characterize that as a contract-like thing. There was a employment contract, and part of that contract was that the person was supposed to be paid in a certain way, they didn't do it. And so if you take that argument to its extreme, you have simply undone Sentinel Tribe because every federal statute that creates a cause of action, you could try and fit it into a tort or contract bucket, and then turn around and say because, and most states have, waivers of sovereign immunity for contract claims or for tort claims, Sentinel Tribe would be gone. And so that's the other point. No, but most states, like Alaska does now, for them it's that waiver to state courts. Pardon? That's an issue where if you could, and that's the second issue, if you decide, well, this is a tort claim, so it's subject to the statute. What I'm saying is I don't think your argument goes away if Sentinel Tribe holds water. Well, I think we have that part of the argument clear enough, probably as clear as you're going to be able to make it today. Could you come back to the retaliation aspects? I'm still troubled by the notion that his affidavit, you're saying that his affidavit is too imprecise to raise a question of racial complaint pre-October 22nd, because I still haven't understood why the diversity office somehow got involved in this. Is this simply a problem between Fairbanks and Anchorage? I take it they don't exist to adjudicate differences between the two campuses to create diversity or non-diversity. Is that it? It's not in the record exactly what claims Truder Franklin's office had jurisdiction over back at that time. The likely explanation for why was Truder Franklin involved is the words discrimination did appear as complaints, and so the university decided to take a look and say, well, what discrimination are you complaining of, and quickly learned that it was an Anchorage-Fairbanks issue, and again, looking at... Well, that's speculation. That's not in the record. Well, Excerpt of Record 328 not only explains... I mean, Excerpt of Record 328 explains exactly how the university viewed this. And the university said, look, you're complaining about pay discrimination. That's subject to pay classifications. That's subject to a separate different procedure. And this does not... And then it went on to say this is not a discrimination claim. And, again, his affidavit actually is very precise. His affidavit says, I complained of discrimination, and I complained of failed percentage of claims over and over. He is referring... He's absolutely right. He was referring to this Anchorage-Fairbanks pay issue, and it could very well be, from Mr. Moon's lay understanding, that complaining of the Anchorage-versus-Fairbanks pay discrimination issue indeed does trigger Title VII. It doesn't. But, you know, so that way his affidavit is precise, but it's just important to understand and view the record in terms of what he was talking about. And, again, when you look at Supplemental 649, which is his January 2003 grievance, compared to that, it was from... This case was not about race until January 2003. From then on, things changed, but certainly not before then. And, again, the standard is the university also has to be made reasonably aware that he's engaging in this protected activity. It's not enough that he intended to do this. He has to... For the university to be liable for retaliation, they have to know, be reasonably aware that he's engaging in protected activity under Title VII. All right. Thank you. Thank you. And turning really quickly, you know, there's a lot of other issues. If the panel has questions about Penalty 412, we can answer that. I'm briefly covering, you know, the other Title VII claims that have appeared. There's a house-to-work environment claim, and our central point of house-to-work environment claims, we have two isolated outbursts over the course of two years. That, combined with his other allegations, simply isn't enough. Turning to his discreet act, there are two discreet act claims on appeal. One is not being promoted to director for summer sessions. That's tie-barred, and we can see that that's tie-barred. The only other discreet act claim, as before this case had appealed, is Mr. Moon's specific claim that, while I held the position of facility scheduling coordinator, I was not paid overtime. That claim was dismissed in summary judgment because Mr. Moon put forth no evidence, not only of his own situation in terms of what his classification was, but did not identify a single similarly situated person in what position they held, what their classifications were. There's absolutely no evidence related to whether they got overtime or not. So the district court simply dismissed that claim in summary judgment. Now, he had a different claim where he said, when I was cap coordinator, which is a different position, I didn't get overtime and someone else outside of cap class did. And that claim got passed in summary judgment. That was dealt with in the motion for judgment. The university noted that it turned out that wasn't true, that that's a separate issue. For purposes of the facility scheduling coordinator claim, there was no evidence below. I see I'm out of time and want to give Ms. Counsel a chance to respond unless you have further questions. No, thank you. Thank you very much, Your Honor. If we might go back to the issue of whether Mr. Moon had submitted sufficient evidence that he made a complaint prior to October 2002, October 22, 2002, we can turn to excerpt from the record, 124, which is the first page of Mr. Moon's last page that was filed in opposition to that motion. The paragraph 2 begins, Prior to filing my October 22, 2002 grievance, I spoke with Mr. Means, and it continues on. And then we get back into what we talked about earlier, where Mr. Moon explained that he spoke with him about discrimination that the University of Rochester brought in. But is he referring to overtime? Well, no. He spoke with Mr. Means about overtime. He also spoke with him about racial and religious discrimination at that time. That's what this affidavit was intended to set out and I think does effectively set out, although perhaps not as might have been best put forward. Could you point to me where he does that? Because all I see is his reference to overtime pay, discriminatory treatment in this respect. That's in paragraph 3. I don't see any references to racial discrimination. In paragraph 3, he does talk about, and I'm looking at lines 5 and 6, I attempted to file this complaint both as a grievance for discrimination as well as for overtime pay. He's clearly considering those two distinct complaints. Also, it references the Civil Rights Act in paragraph 3, line 10. Further on in paragraph 5, he talks about bringing in campus diversity and compliance. Again, while it's probably not the best drafted affidavit, it is an affidavit that puts sufficient evidence into the record that summary judgment should not have been granted. Where the University's counsel has argued that Excuse me. What was the ER site that you were on that affidavit? That is 124 and transfer to 146. Thank you. Where the University's counsel has argued that this claim did not become about race until January 2003, that is clearly incorrect because this lawsuit was filed in October 2003. There was also an EEOC charge that was filed in October 2003. When he references ER 328, of course that memo does talk about the overtime FLSA grievance, but that's because that was the only formal grievance in place at that time because Mr. Moon had been instructed not to file, or that he couldn't file the formal grievance that he wanted to file that included the discrimination complaint. So ER 328 doesn't really tell us anything about the complaints that went on before October 2002. Also speaking briefly about the FLSA retaliation claim, the Byrne case analyzed the section 215, which is the section of the statute that prohibits retaliation. It is actually on point with respect to the issues in this case. Now, yes, it is in the context of a tax court ruling, but the Third Circuit could have determined, yes, it's a tort, yes, it's a contract, yes, it's something else. It wasn't limited to selecting between a tort and a contract. And what it did was look at the background law of torts. It looked also at contracts. It looked at legal dictionaries. It looked at the statute. It determined that this type of claim was best classified as a tort. And as Your Honor pointed out, the Alaska legislature has waived sovereign immunity for torts. It's not a Seminole tribe issue because it's not an issue where Congress is attempting to waive a state statutory to prove state sovereign immunity. Finally, I did want to address, I didn't get a chance to do this originally, but there is the fifth claim, which is what happened at the end of the case where Mr. Moon's counsel in the trial court, without authority, attempted to waive his right to try the claim, and that's a substantive right, and without authority that cannot bind. Well, he didn't waive the right. He did what maybe a good attorney would do. I mean, he filed a non-opposition to a motion. And that's not waiving a client's right. That's making a professional judgment. You don't have a ground, you know, a non-frivolous ground to oppose a motion. Isn't that what he did? When it comes to dismissing a claim, I think that's different than simply not opposing a motion, and there's case law cited in... You mean you have to take a chance of filing a frivolous opposition and being subject to Rule 11 sanctions? No, absolutely not. I wouldn't want any attorney to file a frivolous opposition in violation of Rule 11, but I think that if he feels that he cannot credibly oppose the motion, and if his client, and it's in his filing, if he says, my client is adamant that he doesn't want to dismiss this, he wants this case to go forward, he wants his day in court, if his attorney finds himself in that position, what he needs to do is bring that to the attention of the trial court and ask the court to allow him to withdraw his counsel. That would be an appropriate thing to do. It is absolutely inappropriate and ineffective for his trial court counsel to voluntarily dismiss his claim. An attorney, generally speaking, absolutely can bind their client, but that authority goes only so far, and it's constrained by principles of agency, and there's case law cited in both our opening and our reply brief that shows that an attorney cannot waive a substantive right of his or her client. It's similar to waiving a right of a criminal defendant. An attorney could not enter into a plea agreement for a criminal defendant and say, well, that was my best judgment. There are fundamental rights that are held by the parties to the lawsuit, and this is one of those. And so Mr. Acker, the trial court attorney, was ineffective. He cannot, as a general rule, bind... So what's the remedy at this point? What should the district court have done if you bought your argument? Well, I think the district court has great discretion in what it could have done. It could have entertained Mr. Mung's request for a status conference where he could appear personally. Granted, that came later after it was dismissed. It could have granted Mr. Acker leave to withdraw and perhaps postpone the trial so that the case could be handled by a different attorney on Mr. Mung's behalf. I think that it was probably clear to the trial court throughout the filings and through the record here that Mr. Mung's original attorney was not handling this in the best manner possible. So at any time a district court decides that a retained counsel is not... He was retained counsel, was he not? He was. Is not doing the best job of advocacy, the district court is obliged to invite him to step aside or hold a hearing? I guess I'm not sure what you're saying. No, I don't think it would go that far, but I think where it comes to fundamental rights, the district court needs to exercise its discretion and not accept an unauthorized attempt at waiver of a fundamental right of a party. Can we use it? Let me ask one more question. Can we apply in this situation something like harmless error in the sense that, you know, and there's some indication of this in the record, in the sense that if we can conclude that the district court's judgment was, well, it really doesn't matter what this attorney said because this case is hopeless anyway, so the error is harmless. If he made a mistake, you know, it didn't hurt his client. Can we, assuming it's applicable, can we apply that theory? That's a good question, and I haven't focused on that. First of all, I don't think that this is a hopeless type of case. We have also the issue with the sanctions that we didn't get into very far here, but I've been looking at the sanctions issue too because I think that went into the trial court attorney's decision to dismiss the case, and that's in his filing of non-opposition as well. The trial court, in imposing the sanctions that restricted all of Mr. Moon's evidence, essentially to himself, did not provide an excuse for imposing discretionary sanctions such as that. He ruled that the trial court attorney had not shown excusable neglect under Civil Rule 6, but the case law is clear that there has been. We have that in your brief, so what's the short answer you've judged to show? Well, if Mr. Moon is able to prevail on that issue and the other issues on appeal, or even some of the issues if not all of the issues, then I think that there is not harmless error here, even if he... Assuming harmless error could apply, it wasn't harmless. And you're not conceding that harmless error necessarily should apply. Correct. Okay, got it. All right. Thank you, counsel. We appreciate the argument. Long case, and we appreciate your bonus, counsel. We will take a short recess and then resume with the last two cases on calendar. All rise.
judges: Nelson, Tashima, Fisher